IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAYVON R. FLEMMING,

                              Plaintiff,

        v.                                                          OPINION and ORDER

MARIROSE HOWELL, WHITNEY COWELL, and LT.                23-cv-349-jdp
NERISON,

                              Defendants.

---

Plaintiff Jayvon R. Flemming, proceeding without counsel, alleges that he was deprived of medical care following his suicide attempt and subjected to excessive physical restraint. I allowed Flemming to proceed on Eighth Amendment medical care and physical restraint claims, and Wisconsin-law medical negligence and negligence claims.

Defendants move for summary judgment. Dkt. 25. The undisputed facts show that defendants appropriately responded to Flemming's bleeding and vomiting, and that they made reasonable efforts to ensure that his restraints weren't unnecessarily harsh. I will grant defendants' motion and dismiss Flemming's federal claims. I will relinquish jurisdiction over his state-law claims.

UNDISPUTED FACTS

Flemming didn't respond to defendants' proposed findings of fact (or other summary judgment materials for that matter), even after the court granted him an extension of time to respond, Dkt. 36, so I will accept defendants' proposed findings as undisputed. *See Allen-Noll v. Madison Area Tech. College*, 969 F.3d 343, 349 (7th Cir. 2020); *Smith v. Lamz*, 321 F.3d 680,

683 (7th Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission.").

The following facts are undisputed.

Flemming was incarcerated at Columbia Correctional Institution (CCI) when the events at issue occurred. Defendant Dr. Marirose Cowell was a psychological associate, defendant Whitney Howell was a nurse clinician, and defendant Lt. Nerison was a correctional lieutenant.

Flemming has a long history of engaging in self-harm and then refusing treatment.

On June 15, 2021, Flemming was found unresponsive in his cell. The cell was covered in blood and there was vomit next to Flemming's head. Nurses evaluated Flemming and observed a quarter-inch laceration near his left elbow. Flemming was transported to Aspirus Divine Savior Hospital, where he consented to a laceration repair but refused a blood draw and transfusion. Nondefendant Dr. Murphy treated Flemming at Divine Savior and noted that he had low blood pressure, a rapid pulse, profuse perspiration, and dizziness when he tried to stand. Despite these symptoms, Flemming's blood pressure was stable when he was discharged over two hours later.

Cowell and nondefendant psychologist Dr. Stange discussed a safety plan for Flemming upon his return to CCI. After considering the seriousness of his injury and his history of self-harm and refusing treatment, Stange decided that a bed restraint placement was the least restrictive safe option available. Likewise, nondefendant security director Ryan Blount, in consultation with staff in the psychological and health services units, determined that Flemming would be placed in a bed with his face up and five points of restraint, including a chest strap.

2

Nerison checked Flemming in when he returned to CCI, and he refused a medical assessment or wound care. Flemming was taken to a holding cell in a wheelchair to await a strip search, and he received a meal tray upon his request. While in the wheelchair, Flemming was placed in restraints and tethered to a door for his safety. Nerison directed a correctional officer to constantly observe Flemming. A few minutes later, the officer told Nerison that Flemming was lying on the ground. Nerison entered the cell and Flemming said that he needed to lie down because he was going to throw up. Nerison directed staff to help Flemming off the ground and back into the wheelchair. The tether was removed and Flemming was wheeled to a separate holding cell.

Howell saw Flemming in that holding cell. Howell noted that Flemming was alert and conversant, and that the condition of his skin showed that he was stable. Howell saw that Flemming's laceration was open but not bleeding, and Flemming didn't Howell take his vital signs.

Cowell later arrived to finish Flemming's initial placement assessment, and she stated that she agreed with Blount's decision to place him in bed restraints considering the seriousness of his condition and his history of self-harm. Flemming said that the bed restraints would make him nauseated, and Howell responded that she would give him medication for that condition. After a while, Flemming started to yell and hit the cell door with the tether attached to his wrist, which caused his wound to open more and bleed.

Howell cared for Flemming's wound, took his vitals, and cleared him for placement into bed restraints. Cowell asked security supervisors to place a large pillow wedge under Flemming's head and upper body to reduce discomfort if he had to vomit, and they approved the request. The pillow wedge allowed Flemming to turn his head and upper body to the side if he had to

3

vomit. Flemming vomited after the ankle restraints were secured, and Nerison directed staff to clean up the vomit and keep a bucket near him if he had to vomit again. Once fully restrained, Flemming complained that he was nauseated and occasionally vomiting phlegm. Howell gave Flemming Zofran for his nausea and vomiting, and she confirmed that the restraints had been properly applied and that they weren't causing injury.

Flemming was in bed restraints for 19 hours. During that time, staff conducted regular restraint checks. Health services unit (HSU) staff confirmed that there were no adverse effects or injuries related to the restraints, and Flemming's vitals were taken at regular intervals.

Flemming didn't complain to Howell of chest pain at any point during their interactions. Cowell left CCI after Flemming was restrained because she was on call and it was after hours, but she told staff to call her if anything warranted reevaluating his placement.

## ANALYSIS

### A.  Federal claims

#### 1.  Medical care claim

Flemming is proceeding on two Eighth Amendment medical care claims. To support the first claim, Flemming alleges that Nerison and Howell ignored him when he started bleeding in a holding cell and told them that he was having chest pain and that it felt like he was going to pass out and die. *See* Dkt. 7 at 8–9. Flemming alleges that these events happened after he returned from Divine Savior but before he was placed in bed restraints. *Id.* at 2. To support the second claim, Flemming alleges that Nerison, Howell, and Cowell ignored him while he was in bed restraints even though he was constantly vomiting and told them that he was having chest pains and difficulty breathing. *See id.* at 9.

To establish an Eighth Amendment medical care claim, Flemming must show that he had an objectively serious medical need that defendants consciously disregarded. *See Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). Conscious disregard requires that defendants are subjectively aware of the serious medical need. *See Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017). That means that defendants knew of facts from which the inference could be drawn that a substantial risk of serious harm existed, and they actually drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A correctional officer consciously disregards a prisoner's medical needs by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

The undisputed facts don't support Flemming's first medical care claim. Flemming's wound reopened and started to bleed when, while in a holding cell, he started to yell and hit its door with the tether that was attached to his wrist. Howell didn't disregard Flemming's bleeding; she cared for the wound, took his vitals, and cleared him for placement in bed restraints. Video of Flemming's placement in bed restraints shows that his wound was carefully bandaged and not visibly bleeding. Dkt. 28-8 (0:49–0:51). Furthermore, there's no evidence that Flemming told any defendant that he was having chest pain and that it felt like he was going to pass out and die during this incident, much less that Howell or Nerison thought that to be the case. I will grant summary judgment to defendants on Flemming's first medical care claim because there is no evidence to support it.

The undisputed facts don't support Flemming's second medical care claim. There's no evidence that Flemming was constantly vomiting while being restrained. Flemming vomited after correctional staff secured his ankle restraints, but Nerison and Howell didn't disregard that episode. Nerison directed staff to clean up the vomit and keep a bucket near Flemming if

he had to vomit again. Furthermore, Cowell had obtained approval of a large pillow wedge that allowed Flemming to move his head and upper body to the side if he had to vomit. Once fully restrained, Flemming complained that he was nauseated and *occasionally* vomiting phlegm. But Howell didn't disregard his complaint; she gave Flemming medication for his nausea and vomiting and confirmed that the restraints had been properly applied and weren't causing injury. I can infer that Flemming felt considerable discomfort from the nausea and occasional vomiting while being restrained, but it's clear that defendants were making reasonable efforts to respond to a difficult prison management problem: the restraints were necessary to keep Flemming from harming himself. Furthermore, there's no evidence that Flemming told any defendant that he was having chest pains or difficulty breathing, much less that any defendant thought that to be the case. I will grant summary judgment to defendants on Flemming's second medical care claim because there's no evidence to support it.

### 2. Physical restraint

The use of overly restrictive and unnecessary security measures, including physical restraints, can violate the Eighth Amendment's prohibition against cruel and unusual punishment. *See Hope v. Pelzer*, 536 U.S. 730, 737 (2002). A conditions-of-confinement claim challenging physical restraints is subject to the familiar conscious disregard analysis. *See Gruenberg v. Gempeler*, 697 F.3d 573, 579 (7th Cir. 2012). To prevail, Flemming must show that he faced a substantial risk of serious harm and that defendants consciously disregarded that risk by failing to take reasonable measures to abate it. *See Farmer*, 511 U.S. at 837, 847. As a basic rule, prison officials have a duty to take steps to restrain a self-abusive prisoner, and the Eighth Amendment doesn't allow a prisoner to create a serious danger to himself and then

sue prison officials after they restrain him to protect him from that danger. *See Bowers v. Pollard*, 602 F. Supp. 2d 977, 989–90 (E.D. Wis. 2009).

Flemming bases his physical restraint claim on the same allegations on which he bases his second medical care claim, and the physical restraint claim fails for the same basic reasons. Put simply, there's no evidence that Nerison, Howell, or Cowell disregarded Flemming when he vomited or that they disregarded any complaints of chest pain or difficulty breathing. If Flemming challenges the decision to place him in bed restraints, the undisputed facts show that the restraints were a reasonable response to Flemming's recent injury, long history of self-harm, and refusal of treatment. Also, Flemming was regularly monitored while he was restrained, and he was released from the restrains nineteen hours later. The undisputed facts show that Flemming's bed restraints "were reasonably related to a legitimate and non-punitive" penological goals. *See Karow v. Est. of Heyde*, No. 14-cv-395-jdp, 2017 WL 1194740, at *9 (W.D. Wis. Mar. 30, 2017). I will grant summary judgment to defendants on Flemming's physical restraint claim.

## B.  State-law claims

Defendants contend that the court should relinquish supplemental jurisdiction over Flemming's medical negligence and negligence claims if summary judgment is granted to them on his federal claims. Dkt. 26 at 19. Flemming has not shown that this court could exercise diversity jurisdiction over these claims because there's no evidence that he has different citizenship than that of each defendant. *Cf.* Dkt. 1 at 1–2.

When all federal claims have been dismissed, the general practice in federal court is to decline to exercise supplemental jurisdiction over the related state-law claims. *See Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). I'll follow that practice here

7

and relinquish jurisdiction over Flemming's medical negligence and negligence claims without evaluating their merits.

Flemming may pursue his medical negligence and negligence claims in state court, subject to Wisconsin statutes of limitations (and other potentially applicable procedural bars). Those limitations periods have been tolled while this case has been pending, but they will begin again 30 days from now. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under [the court's supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.").

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 25, is GRANTED. Plaintiff's Eighth Amendment claims against defendants are DISMISSED with prejudice.

2. Jurisdiction is relinquished over plaintiff's state-law medical negligence and negligence claims.

3. The clerk of court is directed to enter judgment and close the case.

Entered January 8, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

8